## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAFEGUARD SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No._____ |
| v. | ) | |
| | ) | |
| WIRELESS GUARDIAN INC., | ) | |
| JASON DUMAS a/k/a JULIO | ) | |
| DUMAS, DWAYNE RATLIFF, and | ) | |
| JAMES CUNNINGHAM a/k/a | ) | |
| JIMMY CUNNINGHAM, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiff  Safeguard Solutions, Inc. ("**Plaintiff**"), by and through its undersigned counsel,

Buchanan Ingersoll & Rooney PC, files the within  Complaint.

## <u>PARTIES AND SUMMARY OF CLAIMS</u>

1.      Plaintiff is a Pennsylvania corporation with its principal place of business located

at 507 N. York Street, Suite 1B, Mechanicsburg, PA 17055.

2.      Defendant Wireless Guardian, Inc. is a Delaware corporation with its principal

place of business located at 2465 Access Road, Covington, Georgia 30016 ("**Guardian**").

3.      Defendant Dwayne Ratliff is an individual who resides at 905 Boogers Hill Road,

Oxford, Georgia 30054 ("**Ratliff**").

4.      Defendant Jason Dumas a/k/a Julio Dumas is an individual who resides at 1030

Anapuni Place, Lahaina, Hawaii 96761 ("**Dumas**").

5.      Defendant James Cunningham a/k/a Jimmy Cunningham is an individual who resides at 1004 Akan St. SE, Leesburg, Virginia 20175 ("**Cunningham**" together with Guardian, Ratliff and Dumas the "**Defendants**" and each individually a "**Defendant**").

6.      As discussed in more detail below, Guardian developed certain security technology which includes various proprietary software applications ("**Software**") on cameras and networking equipment (the "**Equipment**").  The Equipment includes license plate recognition and security cameras, signal intelligence equipment, security, marketing, and ad exchange sensors (collectively, and including the Software, the "**System**").  Guardian sold Systems and represented that Guardian could continually sell data gathered by each System for a substantial profit.  Guardian then promised to share data sales revenues monthly with the End User of each System ("**End User**").

7.      Under this arrangement, Guardian received two streams of income; one from the sale of a System and the other from the sale of data generated by the System.

8.      From the End User perspective, the arrangement was lucrative.  Within a few months, End Users can recoup their initial start-up costs associated with the purchase and installation of a Guardian System.

9.      Plaintiff was one of the End Users who purchased and installed Guardian's Equipment.  To induce Plaintiff's investment in Systems, Guardian initially represented to Plaintiff that Intel Corporation ("**Intel**") was contractually obligated to purchase data collected by the Systems.

10.     Plaintiff paid for 76 Systems.  At all relevant times, Guardian represented to the Plaintiff that Guardian sold to Intel the data gathered by the Plaintiff's Systems.

11.     At first, Guardian regularly made revenue sharing payments to Plaintiff based on statements of revenue provided by Ratliff.  However, after failing to make revenue sharing payments to Plaintiff starting with the February 2024 statement of revenue, Guardian admitted that it was running a scam.  There never were any data sales.  Guardian operated a Ponzi scheme. Guardian used revenue from System sales to fund revenue sharing payments for data sales which never existed.

12.     Ratliff, Dumas and Cunningham (and likely others) orchestrated the Ponzi scheme.  As part of the hoax, Guardian presumably paid millions of dollars to insiders such as the Defendants and their related parties.

13.     Plaintiff now seeks to recover over $7.9 million in damages caused by the Defendants' Ponzi scheme.

## JURISDICTION

14.     This Court has jurisdiction over this civil action under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 (a)(2) because this civil action arises under the laws of the United States and Plaintiff is alleging a cause of action for violation of its rights under Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961 et seq.

15.     This Court also has jurisdiction over this civil action under 28 U.S.C. § 1332 (a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

16.     Venue is proper in the United States District Court for the Middle District of Pennsylvania under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

17.     This action is not a collusive one designed to confer jurisdiction on a court of the United States that such court would not otherwise possess.

## FACTUAL BACKGROUND

18.     Ratliff and Dumas are the founders and directors of Guardian.

19.     Ratliff has been the Chief Financial Officer of Guardian from its founding through the present.

20.     Dumas served in the past as Chief Executive Officer of Guardian.

21.     Cunningham has at all relevant times served as an officer of Guardian and recently became Guardian's Chief Executive Officer.

22.     Guardian advertises itself as a security and technology company which sells Systems and data generated from those Systems.  Among other things, Guardian claims that its Systems will collect various information on vehicles and passengers on nearby roads and highways for the purpose of detecting threats and providing information that assists in identifying any person who is suspected of committing a crime in the area surrounding the System.  The information collected includes but is not limited to certain non-personally identifiable signal intelligence data, license plate numbers, make, and model of these vehicles using license plate recognition and security cameras, signal intelligence equipment, and security, marketing, and ad exchange sensors.

23.     Under its business model, Guardian sells its Systems to End Users who then install the equipment.  The End Users are responsible for entering into lease and security agreement arrangements with property owners to permit the installation and use of the System.  Guardian is then supposed to sell the data generated by the System and share the revenues from the data sales with the End Users.

24.     Guardian represented it had a contractual relationship with a major data buyer Intel who would pay $0.015 per unique device captured by each System and that the data sales are so lucrative that customers can recoup their initial investment costs within a few months and then earn massive annual returns on investment.

25.     Prior to March 23, 2023, Plaintiff's owner met with Dumas, Ratliff and another officer of Guardian Jeff Bernstein ("**Bernstein**") to discuss the Guardian business model in Guardian's New Orleans office.  During a dinner meeting in New Orleans, Dumas and Bernstein presented Plaintiff's owner with a letter purportedly from Intel which confirmed Intel's obligation to purchase data from the Systems at $0.015 per unique device captured by each System.

26.     Based on the representations of Dumas, Ratliff and Bernstein, on March 23, 2023, the Plaintiff and Guardian signed a Reseller Agreement ("**Reseller Agreement**") and Master Services Agreement.   A true and accurate copy of the Reseller Agreement is attached as **Exhibit A** and the Master Services Agreement is attached as **Exhibit B**.

27.     Under the Reseller Agreement, Plaintiff agreed to purchase Systems from Guardian.  In addition, Plaintiff agreed to install the Systems at certain locations that were approved by Guardian.  In turn, Guardian agreed to gather and sell the data generated by the Systems and share the proceeds from the data sales with the Plaintiff.

28.     Across three purchase orders, Plaintiff committed to purchase a total of 92 Systems of equipment from Guardian, and eventually paid for and received 76 Systems.  The average cost of each System was $93,325.  Attached as **Exhibit C** are true and accurate copies of all purchase orders placed by the Plaintiff on equipment purchased by Plaintiff.

29.     In total, Plaintiff paid a total of $7,092,774.90 for Systems.  As required by
Guardian, Plaintiff made the following payments by wire transfer on the following dates:

| Purchase Order | Payment Date | Amount of Payment |
|---|---|---|
| #1 | 3/31/23 | $1,694,038.05 |
| #1 | 12/28/23 | $929,317.05 |
| #2 | 2/20/24 | $1,457,419.50 |
| #2 | 4/19/24 | $1,457,419.50 |
| #3 | 6/6/24 | $1,554,580.80 |

30.     Plaintiff entered into third-party lease and security agreements with property
owners to obtain their permission to install and use the Systems at various sites.

31.     During the installation of the Systems and after the equipment was in operation,
Defendants represented repeatedly to the Plaintiff that Guardian was selling the data gathered by
the Plaintiff's Systems.  Guardian then made regular ACH payments to Plaintiff for what
Defendants represented to be Plaintiff's share of the proceeds from the sale of data gathered by
Plaintiff's Systems.

32.     From the inception of their business arrangement, Guardian sent the Plaintiff
detailed records of the data gathered by the Systems installed by Plaintiff and the calculation of
Plaintiff's share of the revenues from the sale of data gathered by the Systems ("**Statements of
Revenue**").  A true and accurate summary of all Statements of Revenue and a copy of all these
Statements of Revenue is attached as **Exhibit D**.

33.     Under the first purchase order, Plaintiff bought 30 Systems.  Based on the
performance of the first 30 Systems installed by Plaintiff as set forth in the Statements of Revenue,

Plaintiff was to recover its investment within five-to-six-months. The price paid for the data generated by Plaintiff's systems was $0.015 per unique device. This equated to $0.00675 paid to Plaintiff as the End User (50% share) and $0.000675 per unique device to Plaintiff as a reseller (5% share).

34.    Based on the November 2023 Statement of Revenue, Plaintiff's Systems generated approximately $19,130 a month in revenue per System and this induced Plaintiff to make its second purchase order for another 30 Systems and to continue to invest in employees and other operating costs.

35.    As further inducement, in November and December of 2023, Ratliff and Guardian represented to the Plaintiff that the price paid by Intel for data was going to increase to $0.02 per unique device starting in January of 2024. This equated to payments of $0.009 to Plaintiff as the End User and $0.0009 as the reseller for a total of $0.0099 per unique device. The January 2024 Statement of Revenue confirms this increase in pricing. With this increase in revenue, Plaintiff would be able to cover the cost of purchasing the System in approximately 4 months.

36.    Ratliff cultivated a friendship and position of trust with the owner of the Plaintiff ("**Owner**"). For example, both Ratliff and the owner shared a mutual love of hunting. Ratliff participated in a variety of hunting activities with the owner and spent a lot of personal time with the owner through hunting. Here is a summary of those activities:

| Date | Event |
|---|---|
| 2/9/23 | Ratliff and the Plaintiff's owner attend Sportsman's Outdoor Show in Harrisburg PA and stay at Owner's hunting lodge |
| 5/5/23 – 5/7/23 | Ratliff and the Plaintiff's owner go on a turkey hunt together in Knoxville, PA |
| 11/5/23 – 11/9/23 | Ratliff and the Owner go on an archery hunt in IL at Owner's farm. |

| 11/30/23 – 12/2/23 | Ratliff and the Plaintiff's owner go on a gun hunt in IL at Owner's farm. |
| 2/6/24 – 2/8/24 | Ratliff and the Owner attend Sportsman's Outdoor Show in Harrisburg, PA and stay at Owner's hunting lodge. |

37.    As explained in more detail below, Ratliff used the position of friendship and trust he cultivated with the Owner to commit fraud against the Plaintiff and its Owner.  In fact, Ratliff finalized the terms of the second and third purchase order with the Owner during the hunting trips in November and early December of 2023 at the Owner's Illinois farm.

38.    For the majority of their business arrangement, Plaintiff and Guardian held a telephone conference once a week to discuss Guardian's financial condition, Guardian's operations, data sales tied to Plaintiff's Systems and other issues (the "**Weekly Meetings**").  Ratliff participated in nearly all of these Weekly Meetings.  The parties often exchanged emails with respect to these meetings.  True and accurate copies of some of these emails exchanged in connection with these Weekly Meetings are attached as **Exhibit E**.  Except as set forth below, in all these communications, the Defendants represented that Guardian's data sales were strong and gave no indication that Guardian had any problems or delay in monetizing the data.  Therefore, the Plaintiff continued to expend time and resources.

39.    From the revenue earned off the August of 2023 through January of 2024 Statements of Revenue, Guardian paid Plaintiff timely and within the terms of the Reseller Agreement for data revenue sales.

40.    During their hunting trip together on February 6 through February 8, 2024, Ratliff gave no indication to Plaintiff's owner that there was any disruption in data sales.  Ratliff merely mentioned that Intel was pressuring Guardian to start selling to data buyers directly instead of

going through Intel as a middle-man.  Ratliff mentioned that they were in process of this transition, but noted that Guardian and End Users would only make more under this new arrangement.

41.     Guardian failed to make the February 2024 revenue sharing payment to the Plaintiff when the payment was due.

42.     When confronted by the Plaintiff concerning the missed February 2024 payment, Guardian and Ratliff assured Plaintiff that the February 2024 payment would be made in short order.

43.     On April 23, 2024, during a telephone conference, Ratliff assured the Plaintiff that the February 2024 payment would be made "soon" and did not indicate there were any operational concerns with respect to the payment.

44.     Based on Defendants' representations concerning data sales and other representations, on April 25, 2024, Plaintiff placed the third order for another 32 equipment units with Guardian and drafted a proposal to Guardian to purchase more units over the next six months.

45.     On April 26, 2024, Cunningham sent all End Users and resellers a letter to announce his appointment as Guardian's new Chief Executive Officer.  A true and accurate copy of this letter is attached as **Exhibit F**.  In this letter, Cunningham touted Guardian's strong financial performance.  Cunningham further stated "I promise that we will communicate more often and with more transparency." [Ex. F]

46.     On April 30, 2024, in an email to Plaintiff, Ratliff told Plaintiff that "We are processing payments tomorrow" including the February 2024 monthly revenue sharing payment owed to Plaintiff.   In the subsequent Weekly Meetings zoom call held later that day, Ratliff confirmed that there were no operational concerns at Guardian.

47.     By May 14, 2024, Guardian had still not made the February 2024 revenue sharing payments to the Plaintiff and not provided Plaintiff with either the March 2024 or April 2024 statement of revenue.

48.     On May 14, 2024, during a Weekly Meetings zoom conference, Ratliff informed Plaintiff that Guardian would make the February 2024 revenue sharing payment to the Plaintiff very soon and claimed that the delay in payment was due to wire amount limits with Guardian's bank.  Ratliff further assured Plaintiff that the wire issue was temporary and would be resolved shortly.  During this call, Ratliff further discussed data sales and gave no indication of any problems or concerns with data sales.

49.     During the May 14, 2024 conference call with Plaintiff, Ratliff said that unless the Plaintiff made a $1,554,580.80 payment on Plaintiff's third 32 System equipment order, Plaintiff would lose its place in line for the new equipment.

50.     By May 17, 2024,  Guardian had still not made the February 2024 revenue sharing payment to the Plaintiff.  Plaintiff called and spoke to Ratliff on the phone and asked Ratliff to "come clean as you pay us by ACH not wire." Plaintiff asked what was really going on.  In response, Ratliff stated that there were some minor cash flow issues at Guardian because Guardian had just purchased a large amount of equipment and data buyers were paying more slowly under the new direct arrangement  Otherwise, Ratliff reported that all was well with Guardian's operations.  Furthermore, Ratliff assured Plaintiff that if there were any major issues, he would visit Plaintiff's owner personally to notify Plaintiff of any major issues.

51.     On May 28, 2024, during a telephone call, Ratliff repeated to the Plaintiff that the Plaintiff was about to lose its place in line if the Plaintiff did not make a payment of $1,554,580.80

million for new equipment.  In the meantime, Ratliff had forwarded to Plaintiff a March 2024 statement of revenue.

52.     On May 31, 2024, Guardian made the February 2024 revenue sharing payment to the Plaintiff by wire.

53.     On June 6, 2024, and based on Cunningham's promise of transparency and the repeated assurances from Ratliff that all was going well with data sales, Plaintiff sent to Guardian by wire the $1,554,580.80 payment for new equipment as demanded by Guardian.

54.     On June 10, 2024, just 4 days after Plaintiff made its $1,554,580.980 payment for new Systems, Plaintiff received notice that Guardian had suspended payments to End Users and resellers.

55.     This triggered the following text exchange between Ratliff and the Owner from June 10th to June 12th:



56.     Later on June 12th, 2024, Plaintiff's owner and Ratliff had a phone call.  During that call, Ratliff admitted to Plaintiff for the first time that Guardian had not monetized any data collections for a long time and that Ratliff had personally known about this fact for a long time.  Ratliff further admitted that Guardian had fabricated data gathering and sales records to induce Plaintiff and others to believe that data collections had been monetized when in fact they had never been monetized.  Ratliff further admitted that Guardian had engaged in a Ponzi scheme by using equipment sale proceeds to cover data revenue share payments to Plaintiff and others.

57.     On June 12, 2024, Ratliff and Dumas sent Plaintiff and other Guardian customers a Statement from the Board of Directors dated June 11, 2024, a true and accurate copy of which is attached as **Exhibit G**.

58.     In this letter dated June 11, 2024, Ratliff and Dumas admitted that they had not been making any data sales for "some time."  They wrote:

> However, contrary to some circulating information, we have not been receiving payments for our data for some time.  Instead, we have strategically decided to inventory this data for eventual sale to buyers.  We have already entered contracts and are in discussions with potential buyers to secure these sales.

59.     On June 12, 2024, Plaintiff spoke to Guardian's Chief Executive Officer Cunningham by phone.  During that call, Cunningham admitted that he had known since at least May 8th 2024 about the failure of Guardian to monetize any of its data collections.

60.     Therefore, Cunningham knew about the failure of Guardian to monetize any of its data well before Plaintiff made its $1,554,580.980 payment on June 6, 2024 for new Systems.

61.     On June 12, 2024, Cunningham sent a letter to Plaintiff and all Guardian customers, a true and accurate copy of which is attached as **Exhibit H**.  In this letter, Cunningham reported that Dumas had disappeared, and a missing person's report had been filed in an apparent suicide or effort to hide from his financial crimes.  From this incident it may reasonably be inferred

that Dumas was an active participant in the fraud and was trying to escape the consequences of his criminal conduct in some manner.

62.     On June 12, 2024, Cunningham sent a second letter to Plaintiff and all Guardian customers admitting the fraudulent scheme.  A true and accurate copy of this second letter is attached as **Exhibit I**.  In this second letter, Cunningham states that Dumas and Ratliff had admitted their fraudulent conduct and that this fraud was a "surprise" to Cunningham.  Cunningham further stated that "the bitterness of the deception is hard to manage." [Ex. I]

63.     Based on the foregoing, it is clear that Plaintiff is a victim of a fraudulent scheme.

64.     As early as April 2023, Defendants knew that Guardian was not monetizing any data collections.  Despite this, the Defendants hid from the Plaintiff that there were no data sales.  Moreover, Defendants manufactured false business records to give the appearance to Plaintiff and other Guardian customers that Guardian had monetized data collections and that revenue share payments made to Plaintiff and others was out of data sales.  This induced the Plaintiff and others to purchase more equipment from Guardian.

65.     In actuality, any payments made to Plaintiff and other Guardian customers were from revenues generated by the sale of Systems as part of a Ponzi scheme.

66.     Defendants made the following misrepresentations of fact to Plaintiff at multiple times throughout 2023 and 2024 including without limitation in connection with the Weekly Meetings:

- Defendants represented that data sales existed when in fact they did not exist.

- Defendants represented that Guardian was making revenue sharing payments to Plaintiff and others out of data sale proceeds and not equipment sale proceeds when in fact the opposite was true.

- Defendants represented that all the data sale figures presented by Defendants in the reports attached as Exhibit D were true and accurate when in fact some or all of the records were fabricated and false because there were no data sales.

- Guardian and Cunningham would be transparent and communicate more often with End Users.

- Ratliff would visit the Owner personally if there were ever any serious operational concerns at Guardian.

67.     Defendants fraudulently concealed from the Plaintiff the following facts at multiple times throughout 2023 and 2024 during the Weekly Meetings and on other occasions including the hunting trips taken by Ratliff and Plaintiff's owner:

- Defendants concealed that Guardian had no data sales.

- Defendants concealed that Guardian was making revenue sharing payments out of System sales and not data sales.

68.     Defendants provided Plaintiff with false financial records concerning data sales throughout 2023 and 2024 including without limitation the records attached as Exhibit D. Defendants represented that there were data sales in these records when in fact there were no such sales.

69.     Defendants made a number of misrepresentations to Plaintiff concerning the February 2024 revenue sharing payment including without limitation the following:

- Defendants misrepresented that Guardian was going to make the February 2024 payment "soon" or "within a day" when in fact Guardian never intended to make that February 2024 payment soon or within a day.

- Defendants misrepresented that the delay by Guardian in making the February 2024 payments was caused by bank wire limitations when in fact no such limitations existed and Plaintiff was always paid by ACH.

- Defendants misrepresented that Guardian's delay in making the February 2024 payment was caused by slow paying data buyers and expenditures made by Guardian on new equipment when in fact there were no data sales.

- Defendants misrepresented the existence of a price increase from Intel.

- Defendants misrepresented the existence of more lucrative sales to other data buyers.

70.      Defendants fraudulently concealed from the Plaintiff the fact that the delay by Guardian in making the February 2024 payment was due to the collapse of the Defendants' Ponzi scheme.

71.      Defendants fraudulently represented to the Plaintiff on May 14, 2024 and May 28, 2024 that the Plaintiff needed to make a payment of $1,554,580.80 for the Plaintiff to keep its place in line for the purchase of new equipment.   In fact, the Plaintiff did not need to make any payment to "keep its place in line."   Defendants needed the infusion of cash to perpetuate their Ponzi scheme and to scam the Plaintiff one more time.

72.      As a result of the fraud perpetrated upon the Plaintiff, the Plaintiff has suffered substantial operating losses totaling $6,483,257.21 as of July 8, 2024.  Plaintiff still is spending $250,000 a month.   A detailed breakdown of these losses is attached as **Exhibit J**.

73.      In addition, it's estimated the Plaintiff will incur another $1 to 1.5 million to wind down its business and its lease and security agreements with third parties.

74.      There is no meaningful salvage value for each System.  The component parts in each System have a retail value of about $5,000.   Only the Intel agreement to purchase data added value to a System and caused End Users to pay a high price for each System.  Now that it is clear that the Intel agreement never existed, the Systems have no meaningful salvage value.

75.      Therefore, Plaintiff has been damaged in the amount of at least $7,983,257.21.

## COUNT I:  FRAUDULENT MISREPRESENTATIONS AND CONCEALMENT
### (Against All Defendants)

76.      Plaintiff repeats and realleges all prior allegations.

77.     At all relevant times, Ratliff and Dumas were the most senior officers and directors of Guardian who were primarily responsible for Guardian's operations.

78.     Defendants orchestrated, and were the beneficiaries of, a massive fraudulent scheme to misrepresent and conceal information from Plaintiff.

79.     Defendants knew that Guardian was not monetizing data collections since at least April of 2023.  Despite this, Defendants manufactured false business records to give the appearance to Plaintiff and other Guardian customers that Guardian had monetized data collections and that revenue share payments made to Plaintiff and others was out of data sales.  This induced the Plaintiff and others to purchase more equipment from Guardian.

80.     In actuality, any payments made to Plaintiff and other Guardian customers was out of System sales as part of a Ponzi scheme.

81.     Guardian had no data sales.

82.     Defendants made the following misrepresentations of fact to Plaintiff at multiple times throughout 2023 and 2024 during the Weekly Meetings and on other occasions including the hunting trips between Ratliff and the Owner:

- Defendants represented that data sales existed when in fact they did not exist.

- Defendants represented that Guardian was making revenue sharing payments to Plaintiff and others out of data sale proceeds and not System sale proceeds when in fact the opposite was true.

- Guardian and Cunningham would be transparent and communicate more often with End Users.

- Ratliff would visit the Owner personally if there were ever any serious operational concerns at Guardian.

83.     Defendants fraudulently concealed from the Plaintiff the following facts at multiple times throughout 2023 and 2024 during the Weekly Meetings and on other occasions:

- Defendants concealed that Guardian had no data sales.

- Defendants concealed that Guardian was making revenue sharing payments out of System sales and not data sales.

84.     Defendants provided Plaintiff with false financial records concerning data sales throughout 2023 and 2024 including without limitation the records attached as Exhibit D. Defendants represented that there were data sales in these records when in fact there were no such sales.

85.     Defendants made a number of misrepresentations to Plaintiff concerning the February 2024 revenue sharing payment including without limitation the following:

- Defendants misrepresented that Guardian was going to make the February 2024 payment "soon" or "within a day" when in fact Guardian never intended to make that February 2024 payment soon or within a day.

- Defendants misrepresented that the delay by Guardian in making the February 2024 payments was caused by bank wire limitations when in fact no such limitations existed and always paid Plaintiff by ACH

- Defendants misrepresented that Guardian's delay in making the February 2024 payment was caused by slow paying data buyers and expenditures made by Guardian on new equipment when in fact there were no data sales.

- Defendants misrepresented the existence of a price increase from Intel.

- Defendants misrepresented the existence of more lucrative sales to other data buyers.

86.     Defendants fraudulently concealed from the Plaintiff the fact that the delay by Guardian in making the February 2024 payment was due to the collapse of the Defendants' Ponzi scheme.

87.     Defendants fraudulently represented to the Plaintiff on May 14, 2024 and May 28, 2024 that the Plaintiff needed to make a payment of $1,554,580.80 million for the Plaintiff to keep its place in line for the purchase of new equipment.  In fact, the Defendants needed the infusion of cash to perpetuate their Ponzi scheme and to scam the Plaintiff one more time.

88.     Ratliff and Dumas caused Guardian to maintain separate sets of accounting records to accomplish their fraud.

89.     At the time that the Defendants made their material representations to Plaintiff, Defendants knew that the representations they made to Plaintiff were false and misleading.

90.     At the time that they concealed material information from the Plaintiff, the Defendants knew their concealment was false and misleading.

91.     Defendants made their misrepresentations and concealed information to induce Plaintiff to purchase equipment from Guardian, enter into third-party lease and security agreements, install that equipment and refrain from doing anything to disrupt the Ponzi scheme of the Defendants.

92.     Plaintiff justifiably relied upon the Defendants' misrepresentations and the Defendants' concealment of information to Plaintiff's detriment by causing the Plaintiff to expend substantial sums of money on a Ponzi scheme.  But for the Defendants misrepresentations and concealment of facts, Plaintiff never would have done any business with Defendants.

93.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has suffered more than $7.9 million in damages plus interest, legal fees, and costs.

94.     Defendants' fraudulent misrepresentations and fraudulent concealment of facts were outrageous, willful, wanton, and with a conscious disregard of the rights of others. Accordingly, Plaintiff is entitled to punitive damages.

   **WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in its favor, and against Defendants jointly and severally, in an amount in excess of the jurisdictional limit of this Court, together with punitive damages, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

18

## COUNT II:  NEGLIGENT MISREPRESENTATION
**(Against All Defendants)**

95.      Plaintiff repeats and realleges all prior allegations.

96.      As set forth above, Defendants orchestrated a fraudulent scheme against the Plaintiff.

97.      In the alternative, to the extent that Defendants assert that they did not know that their representations were false at the time they were made or their concealment of facts was misleading, Defendants should have known that their representations and omissions were false and misleading and/or the Defendants acted with reckless disregard for the truth.

98.      Plaintiff relied on the misrepresentations and omissions of Defendants when Plaintiff decided to purchase Systems from Guardian, enter into third-party lease and security agreements and install those Systems.

99.      Plaintiff justifiably relied upon the misrepresentations and omissions of the Defendants.  Plaintiff never would have purchased Systems from Guardian or participated in a revenue sharing arrangement with Guardian had Plaintiff known the true state of Guardian's financial affairs.

100.      As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has suffered more than $7.9 million in damages plus legal fees and costs.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in its favor, and against Defendants jointly and severally, in an amount in excess of the jurisdictional limit of this Court, together with punitive damages, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT III:  VIOLATION OF RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1961 *et seq.*)
**(Against All Defendants)**

101.    Plaintiff repeats and realleges all prior allegations.

102.    Guardian is an enterprise engaged in activities which affect interstate commerce.

103.    Cunningham, Ratliff and Dumas are persons within the meaning of 18 U.S.C. § 1961(3) and, as persons employed by/associated with Guardian, conducted and participated, directly and indirectly, in the conduct of affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

104.    Beginning in 2023, as a necessary component of the execution of the Defendants' scheme to obtain funds from Plaintiff and siphon them for their own benefit, the Defendants conducted or participated, directly or indirectly in the conduct of the enterprises' affairs through a pattern of racketeering activity including (but not limited to) multiple instances of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

105.    The Defendants engaged in mail fraud in violation of 18 U.S.C. § 1341 by using the mail to make false, fraudulent, and misleading representations (or cause them to be made) in order to execute their scheme to siphon funds from the various enterprises they controlled.  In particular:

      (a)    In 2023 and 2024, the Defendants used the mail to negotiate, finalize, and close its contractual arrangements with the Plaintiff.

      (b)    In 2023 and 2024, the Defendants used the mail to send the Plaintiff false financial information concerning data sales.

      (c)    In 2023 and 2024, the Defendants used the mail to send the Plaintiff false invoices.

106.    The Defendants made these false, fraudulent, or misleading statements (or caused them to be made) with the intent to defraud and to execute their scheme to siphon money from the enterprises that they controlled.

107.     The Defendants knowingly used federally regulated mails for the purpose of executing their scheme and artifice to siphon money from the enterprises that they controlled.

108.     The use of the federally regulated mails was essential and/or incident to essential parts of the scheme and artifice to siphon money from the enterprises that the Defendants controlled.

109.     The Defendants engaged in wire fraud in violation of 18 U.S.C. § 1343 by using wire transfers in order to make false, fraudulent and/or misleading representations (or cause them to be made) in order to execute their scheme to siphon money from the enterprises that they controlled.  In particular:

       (a)     In 2023 and 2024, the defendants used wire payments to send and receive payments as part of their Ponzi scheme.

110.     The Defendants made these false, fraudulent, or misleading statements (or caused them to be made) with the intent to execute their scheme to siphon money from the enterprises that they controlled.

111.     The Defendants knowingly used federally regulated wire communications for the purpose of executing their scheme and artifice to execute their scheme to siphon money from the enterprises that they controlled.

112.     The use of the federally regulated interstate wire communications was essential and/or incident to essential parts of the scheme and artifice to execute their scheme to siphon money from the enterprises that they controlled.

113.     The acts of racketeering were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

114.     The acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

115.     The System sale proceeds that Guardian obtained by virtue of the Defendants' pattern of racketeering activities were used to perpetuate their Ponzi scheme and allowed Defendants to execute their overall scheme to siphon money from the enterprises that they controlled, all of which caused injury to Plaintiff.

116.     Plaintiff was actually, proximately, and directly injured in its business and property.  In particular, Plaintiff lost more than $7.9 million that it would not have otherwise lost but for the Defendants' pattern of racketeering activities.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in its favor, and against the Defendants, jointly and severally, for compensatory damages trebled in accordance with the law, interest, costs, attorneys' fees, and any further relief that this Court deems to be just and proper.

**COUNT IV:  CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(d))**
**(Against All Defendants)**

117.     Plaintiff repeats and realleges all prior allegations.

118.     The Defendants agreed and conspired to conduct the affairs of Guardian through a pattern of racketeering activities consisting of multiple acts of mail fraud and wire fraud, which activities violate 18 U.S.C. § 1962(c).

119.     By agreeing to conduct the affairs of the Guardian through a pattern of racketeering activities, including multiple acts of mail fraud and wire fraud in violation of 18 U.S.C. § 1962(c), the Defendants conspired to violate 18 U.S.C. § 1962(c), which conduct violates 18 U.S.C. § 1962(d).

120.     Plaintiff was injured by reason of the Defendants' violation of 18 U.S.C.A. § 1962(d), in that, as a direct and proximate result of Defendants conspiracy to violate 18 U.S.C. § 1962(c), Plaintiff suffered substantial monetary damages.

  **WHEREFORE**, Plaintiff demands judgment in its favor and against the Defendants, jointly and severally, for compensatory damages trebled in accordance with the law, and interest, costs, reasonable attorneys' fees, and other relief as the Court may deem appropriate pursuant to 18 U.S.C.A § 1964.

### COUNT V:  BREACH OF FIDUCIARY DUTIES
**(Against All Defendants)**

121.     Plaintiff repeats and realleges all prior allegations.

122.     By virtue of their respective positions, the Defendants owed fiduciary duties to Plaintiff.  The Defendants owed Plaintiff the highest obligation of good faith, fair dealing, loyalty, and due care.

123.     The Defendants breached their duties of loyalty by improperly using, diverting, and/or misappropriating the assets of Guardian for their own personal benefit and use.

124.     The Defendants breached their fiduciary duty of care, reasonable inquiry, oversight, good faith, and supervision.

125.     In particular, the Defendants completely abdicated their fiduciary duties by failing to implement internal financial controls and/or otherwise inform themselves of Guardian's activities and financial condition.  The diversion and misappropriation of Guardian 's assets would have been prevented if the Defendants had exercised, in good faith, prudent business judgment to protect and promote Guardian 's corporate interests.

126.     The Defendants similarly failed to exercise due care to obtain and maintain a bonding facility necessary to obtain government contracts.

127.    As a direct and proximate result of the Defendants' failure to perform their fiduciary duties, Plaintiff suffered significant damages.   Defendants are therefore liable to Plaintiff.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in its favor, and against the Defendants, jointly and severally, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

### COUNT VI:  BREACH OF CONTRACT
**(Against Guardian Only)**

128.    Plaintiff repeats and realleges all prior allegations.

129.    The Master Services Agreement and Reseller Agreement are lawful and binding contracts between and among Plaintiff and Guardian.

130.    Guardian breached the Master Services Agreement and Reseller Agreement by failing to sell data gathered by the Plaintiff's equipment.

131.    Plaintiff has suffered damages as a result of Guardian's breach of the Master Services Agreement and Reseller Agreement.

### COUNT VII:  AIDING AND ABETTING A FRAUD
**(Against All Defendants)**

132.    Plaintiff repeats and realleges all prior allegations.

133.    Defendants defrauded the Plaintiff.

134.    Defendants knew of the fraud being perpetrated against the Plaintiff.

135.    Each Defendant provided substantial assistance to aid and abet one another in the commission of the fraud.

136.     As a direct and proximate result of the Defendants' conduct, Plaintiff suffered significant damages.  Defendants are therefore liable to Plaintiff.

WHEREFORE, Plaintiff requests that this Honorable Court enter judgment in its favor, and against the Defendants, jointly and severally, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT VIII:  CONSPIRACY TO COMMIT FRAUD
### (Against All Defendants)

137.     Plaintiff repeats and realleges all prior allegations.

138.     Defendants committed a fraud against the Plaintiff.

139.     Defendants conspired together to commit the fraud against the Plaintiff.

140.     Defendants entered into one or more agreements with one another to commit their fraud.

141.     Each Defendant took action in furtherance of the conspiracy.

142.     As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered significant damages.  Defendants are therefore liable to Plaintiff.

WHEREFORE, Plaintiff requests that this Honorable Court enter judgment in its favor, and against the Defendants, jointly and severally, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues triable to a jury.

Dated:  August 19, 2024

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

By: /s/ Terry Shulsky
    Terry Shulsky
    Union Trust Building
    501 Grant Street, Suite 200
    Pittsburgh, PA  15219
    (412) 392-2901
    *terry.shulsky@bipc.com*

**OF COUNSEL:**

Christopher P. Schueller
(Motion to Admit *Pro Hac Vice* will be filed)
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA  15219
(412) 562–8432
*christopher.schueller@bipc.com*

*Attorneys for Plaintiff*